## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **WENDY SHAW, SUSAN OWENS, JAVIER GONZÁLEZ AND JAMES HARNAR,** | Case No. _____ (___) |
| **Plaintiffs,** | **Re:   Declarative and Injunctive Relief; Breach of Contract; Law No. 204 of December 28, 2016, Puerto Rico Vacation Property Law; Act 118, Consumer Class Action Statute, P.R. Laws Ann. Tit. 32 § 3341, Torts** |
| **Vs.** | |
| **MELIÁ HOTELS INTERNATIONAL, S.A.; SOL MELIÁ V.C. PUERTO RICO CORP; and COCO CONDOMINIUM 1, LLC;** | **Request for Trial by Jury** |
| **Defendants.** | |

"And now, as a member of Sol Meliá Vacation Club, you can experience the vacation of your dreams…Membership is your ticket to a world of unparalleled vacation choices…return to your home resort or explore thousands of global options with our flexible vacation exchange program available through the SMV Network…"

– Sol Meliá (2004) –

"Since the new owner is not part of Meliá Hotels International, the vacation club will not be affiliated with the Meliá Vacation Network."

– Sol Meliá (2019) –

## CLASS ACTION COMPLAINT

**TO THE HONORABLE COURT:**

**COME NOW** Plaintiffs and Class representatives, **Wendy Shaw**, **Susan Owen**, **Javier González,** and **James Harnar**, through their undersigned attorneys and very respectfully allege and pray as follows:

1

## I. NATURE OF THE ACTION:

1.1    Plaintiffs are representative members of the Class, as well as consumers, members and lawful owners of *vacation ownership rights* of Meliá Hotels International S.A. (hereinafter "Meliá International"),[1] provided through Sol Meliá V.C. Puerto Rico Corp. (hereinafter "Sol Meliá PR"),[2] with their "home resort" at Hotel Gran Meliá, Coco Beach Sector of Río Grande, Puerto Rico ("Hotel Gran Meliá").

1.2    Meliá International and Sol Meliá PR breached the contractual obligations undertaken with the Plaintiffs and class members and violated the *bona fide* principle of our civil legal system, besides defrauding the class members, who never expected to be deceived by the prestigious Meliá International brand. In fact, all of them purchased their Meliá *vacation ownership rights* because they relied on that brand and thought it was reputable. Meliá International, Sol Meliá PR and the Escarrer Family[3] pocketed tens of millions of dollars on membership sales made to the Plaintiffs and class members and subsequently again based on that breach.

1.3    In or around the year 2004, Meliá International established Sol Meliá PR for the purpose of entering the Puerto Rico vacation timeshare and club membership market, promoting, and offering to consumers (the Plaintiffs herein) Sol Meliá Vacation Club memberships *via* the purchase of *vacation ownership rights*. Said purchases granted them membership in the "Meliá's experience and brand" for a term of 50 years, which included membership in Meliá International's exclusive *Sol Meliá's Vacation Network* ("SMVN"), an international vacation exchange network.

---

[1] Prior to June 1, 2011, Meliá International was named "Sol Meliá, S.A." It owns over sixty (60) subsidiaries and holding companies.

[2] Sol Meliá PR's corporate status was canceled on December 30, 2023. According to its 2022 Annual Balance sheet it had just $4,410,169.00 in assets.

[3] Although Meliá International is publicly traded, it is still a Escarrer family owned (54.81% of stock) and managed company.

1.4     The SMVN is one of the most coveted benefits in the timeshare/vacation club industry, and the Meliá brand was offering it based out of Puerto Rico.

1.5     In sum, those *vacation ownership rights* are what is marketed and sold by Melia International around the world as **"Sol Meliá Vacation Club"** memberships. They grant access to Melia International's "acclaimed hotel and resort family [that] spans the globe with 350 properties in more than 30 countries on 5 continents." (*See*, Exhibit A, Letter by Gabriel Escarrer Julia (2004) Chairman of Sole Meliá Hotels International).[4] The offer was any family's dream "ticket to a world of unparalleled vacation choices…return to your Home Resort or **explore thousands of global options with our flexible vacation exchange program available through the Sol Melia Network.**" (*Id*.) (Emphasis added.)

1.6     Based on Meliá International's reputation and the codefendants' representations and offering, *between the years 2005 and 2016*, Plaintiffs and the class members eagerly executed membership agreements and others, and paid Sol Meliá PR the purchase price and the membership fees required to become members of the Sol Meliá Vacation Club. Their purchased membership provided them contractual ownership of their *vacation ownership rights* which in turn (i) granted them Sol Melia Option points ("*SMOptions"*) to use the Hotel Meliá in Rio Grande and/or other Sol Melia Vacation Club resorts, <u>plus</u> (ii) SMVN benefits at all properties belonging to the SMVN exchange program and/or affiliate resorts of Meliá International.

1.7     The Plaintiffs and class members paid on average between $18,500.00 and $57,600.00 for their *vacation ownership rights*, depending on the year of purchase, season chosen, unit type (1

---

[4] Gabriel Escarrer Julia was Meliá International's co-owner, Chairman and President *until* the year 2023.

bedroom suite or masters suite, 2 bedroom or 3 bedroom) and amount of *SMOptions* assigned. <u>Plus</u>, approximately $1,000.00 a year in maintenance, SMVN network and other fees.

1.8     Subject to those offerings, between 2005 and 2016, the Plaintiffs and class members purchased $65,000,000.00 worth in Sol Meliá Vacation Club memberships. The target consumers were middle-class families.[5] Most, if not all of the Plaintiffs and class members, purchased said ownership rights to spend cherished time with their families.

1.9     However, Meliá International financed the purchase price of the *vacation ownership rights* for most of the Plaintiffs and class members for the term one hundred and twenty (120) months at between 13% and 14% interest rates, plus closing costs. Thus, the purchase price was more than doubled over ten (10) years and Meliá International and the Escarrer Family received, between purchase price and financing charges, over $140,000,000.00 in proceeds.

1.10    To date, Meliá International continues to offer those same *vacation ownership rights* in the industry and markets them as Club Meliá membership (Sol Melia Vacation Club was rebranded "Club Meliá" in the year 2021), Paradisus by Meliá and The Circle by Meliá.

1.11    After Hurricane Maria struck Puerto Rico in September of the year 2017, Sol Meliá kept the Hotel Meliá in Rio Grande closed and it never resumed operations under the Meliá brand, although it continued to charge the class members <u>all</u> maintenance and other fees related to the executed contracts.

1.12    <u>Unbeknownst</u> to the Plaintiffs and class members, on December 24, 2018, Meliá International, individually, together with and through Sol Meliá PR, sold the Hotel Meliá in Rio Grande to a newly minted limited liability corporation (November 29, 2018), *to wit*, Coco Condominium 1

---

[5]  If U.S. Census and ARDA information (in its 2023 report reflecting 2022 data, the latest available) is accurate, there were about 127 million households in the U.S. in 2020, and 9.9 million households owned timeshares—about 7.8% of U.S. households own timeshares.

LLC ("Coco Beach LLC") and cashed-out its interests in that timeshare/vacation club hotel.

1.13    Pursuant to that sale to Coco Beach LLC, Meliá International and Sol Meliá PR purposefully agreed to cancel, *and did cancel*, all the class members agreed upon *vacation ownership rights* by stripping them of their SMVN memberships and all benefits of Sol Meliá Vacation Club membership to which they were previously entitled to under the Meliá brand. Such cancellation entailed a *de facto* termination of the agreements executed between class members and the codefendants, which in no way can be mitigated or cured with another brand's network exchange program, much less with one that does not match the world-class stature of the Meliá brand.

1.14    As previously stated, the agreed upon *vacation ownership rights* included SMVN membership and <u>no</u> other industry network exchange program equates to it. Further, those *vacation ownership rights* were an enmeshed membership product and package that cannot be divvied-up.[6]

1.15    In sum, thirteen (13) years into their fifty (50) year contractual membership agreements, and <u>after</u> reaping the profits from the sale of *vacation ownership rights* and all recurrent charges, Meliá International and Sol Meliá PR used Hurricane María as a <u>pretext</u> to sell all Puerto Rico assets and in the process breach the trust and contractual obligations with the class members and intentionally deprived them of their agreed upon Sol Meliá Vacation Club membership benefits. The codefendants conduct is untenable.

1.16    Hurricane María was not the reason. In fact, the Plaintiffs have <u>just learned</u> that *in the year 2016* Meliá International set in motion a corporate initiative to discontinue its commercial activities in Puerto Rico and a new "Asset Management Strategy" which required it to divest and sell-

---

[6]  As will be explained, Sol Meliá Vacation Club membership is not the typical timeshares concept sold in the 90s. The industry had become much more sophisticated and Sol Meliá brand offered and sold *vacation ownership rights* to Sol Meliá Vacation Club, which includes Sol Meliá International's entire vacation network, and Meliá International has made billions of dollars doing so.

off non-strategic assets *before the year 2020*, which included the Hotel Gran Meliá.

1.17    Melia International wanted to take advantage of the (i) positive cycle and significant increase in the value of beach front resort style real estate in Puerto Rico, due to Act 20/60 investors flocking to Puerto Rico (2015-2022) and paying record prices for beach front real estate, and (ii) the significant increase in value of the US Dollar against the Euro. The change in currency exchange rates alone granted Melia International and the Escarrer family an extra 10% profit from the sale. As previously stated, the Escarrer family owns 54.81% of Melia International's stock.

1.18    Meliá International and Sol Meliá PR never notified the Plaintiffs and/or class members of that initiative to discontinue commercial activities in Puerto Rico or of that "Asset Management Strategy" to sell-off all real estate assets in Puerto Rico.

1.19    The timing was key to creating significant additional liquidity for both Melia International and the Escarrer family, the latter of which in the year 2016 had just also begun implementing a family succession plan that, upon information and belief, required cash on hand for family members. That succession plan was completed in the year 2023.

1.20    According to Meliá International *Consolidated Management Report and Annual Accounts* for the year 2019, it sold the Hotel Gran Meliá for more than $72,000.000.00, plus covering debt. That sale included the Plaintiffs and class members "home resort" hotel.

1.21    At the time they sold the Hotel Gran Meliá, International and Sol Meliá PR affirmably decided to cut all ties and breach all contractual agreement with the Plaintiffs and class members rather than offer them access to a new "home resort" hotel or an upgrade to its "Circle" membership. Such was Melia International choice despite having at least thirty-five (35) Sol Meliá Club Vacation hotels available. *See*, ¶¶ 4.35 and 4.36 below.

6

1.22    The *vacation ownership rights* contracts executed between the codefendants and the Plaintiffs and class members did not contain any termination or transfer clauses permitting Melia International and/or Sol Meliá PR to cancel or transfer said contacts. Further, upon information and belief, and based on statements made by Melia International, at the time Melia International and Sol Meliá PR sold the Hotel Gran Meliá and canceled said contacts, **Meliá International provided parent company guarantees** to cover any potential "indemnification claims" filed against Coco Condominium 1 LLC and possibly Sol Meliá PR related to the sale.

1.23    Besides depriving the Plaintiffs and class members of their Sol Meliá Vacation Club membership benefits to stay at resorts and hotels around the world, the co-defendants also significantly diminished the remaining resale value of the class members' *vacation ownership rights*.

1.24    That said, the Plaintiffs and Class Members seek redress, *among others*, under the Puerto Rico Multi-Property and Vacation Clubs Act, Act No. 252 of December 26, 1995, as amended, (hereinafter "Law 252") and the Puerto Rico Vacation Ownership Act, Puerto Rico Act No. 204-2016, *as amended*, (hereinafter "Law 204"), 31 L.P.R.A. § 1891, *et seq.,* the Puerto Rico Civil Code and others. As to Act 204, it was enacted in the year 2016 to curtail conduct such as that exhibited by Meliá International and Sol Meliá in this case, and "protect the quality of Puerto Rico's vacation ownership plans and the consumers who purchase them." 31 L.P.R.A. § 1891a. Among other things, Act 204 aims to protect the purchasers of timeshares/vacation clubs and to eliminate deceitful and aggressive practices by implementing certain measures such as the prior disclosure of all the details of the transaction to the seller and the prohibition to make advance payments for the transfer of memberships.

## II.    <u>JURISDICTION</u>

2.1    This Court has federal diversity jurisdiction over the claims contained in the Complaint filed in this case pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). Specifically, since

the Class Action Fairness Act (CAFA)[7] extends federal jurisdiction to class actions involving at least 100 people who request at least $5 million in damages so long as any member of a class of plaintiffs is a citizen of a State different from any defendant. 28 U.S.C.S. § 1332(d)(2)(A), (d)(5), (d)(6).

As the Complaint shows, part of the injuries suffered by the Plaintiffs and class members occurred outside of Puerto Rico since they lost access to the SMVN. Additionally, Meliá International is a citizen of Spain, while all named plaintiffs are citizens of the United States, Puerto Rico and/or Spain: James Harnar, the first named plaintiff is a resident of Maine, U.S.A.; Javier González, the second named plaintiff is a resident of Madrid, Spain; Susan Owen, the third named plaintiff is a resident of New York, U.S.A.; Wendy Shaw, Md., the fourth named plaintiff is a resident of Vega Alta, Puerto Rico; and, Sol Meliá is a resident of Puerto Rico. The Court has jurisdiction over the damages, breach of contract, recission of sale contract and unjust enrichment claims brought forth under the Puerto Rico Civil Code, all asserted against the Defendant.

2.2    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2), since most of the *vacation ownership rights* were purchased in this jurisdiction and a substantial part of the events giving rise to the claims occurred in this District.

2.3    Plaintiffs seek redress of their Act No. 204 consumer violation claim under (i) CAFA and pursuant to (ii) Puerto Rico Law No. 118, The Consumers Act, P.R. Laws Ann. Tit. 32 §§ 3341 – 3344, contained in the Puerto Rico Code of Civil Procedure, which authorizes the filing of class actions by consumers for damages or against monopolies. Act No. 118 is limited to authorizing the filing of class actions by consumers of goods and services for damages when they have cause of action under existing law. They also seek redress under the Puerto Rico Civil Code of 1930, as amended.

---

[7] On December 20, 2020, at Meliá International's request and supported by Sol Meliá PR representations, Honorable Gustavo A. Gelpí recognized via *Memorandum Order* that CAFA applied the same fact scenario and class members described in this case. *See*, 20-1146 (GAG) at D.E. # 33 at Exhibit 4 ¶ 20 and D.E. # 122.

### III.    **PARTIES**

3.1    Plaintiff, **Ms. Wendy Shaw** is a natural person, of legal age, married, retired and a resident of Puerto Rico, United States, who represents all Sol Meliá members, whose contracts entered into under the Meliá mark were breached as a result of the sale of the Hotel Meliá to Coco Beach LLC. Her postal is 158 calle Los Naborias, Vega Alta, PR 00692 and home address Calle Los Naborias #D1, Alturas de Cerro Gordo IV, Vega Alta, PR 00692.

3.2    Plaintiff, **Ms. Susan Owens** is a natural person, of legal age, divorced, retired and a resident of the State of New York, United States, who represents all Sol Meliá members, whose contracts entered into under the Meliá mark were breached as a result of the sale of the Hotel Meliá to Coco Beach LLC.  His postal and home address is 4177 Wetzel Road, Liverpool, NY, USA 13090.

3.3    Plaintiff, Ms. **Javier Gonzalez** is a natural person, of legal age, married, employee and a resident of Spain, who represents all Sol Meliá members, whose contracts entered into under the Meliá mark were breached as a result of the sale of the Hotel Meliá to Coco Beach.  His postal and home address is Calle Ardemans 47,4A, 28028 Madrid, Spain.

3.4    Plaintiff, **Mr. James Harnar** is a natural person, of legal age, married, retired and a resident of the State of New Mexico, United States, who represents all Sol Meliá members, whose contracts entered into under the Meliá mark were breached as a result of the sale of the Hotel Meliá to Coco Beach LLC.  His postal and home address is 57 Don Jose Loop, Santa Fe, NM 87508.

3.5    Plaintiff class members are herein represented by any and all of the above identified representative Plaintiffs, defined as follows:

> As of March 31, 2019, the class is comprised of 2,232 individuals (53 foreigners and 739 individuals [or 35.48%] who are  residents of one or more of the fifty states of the Union; plus 1440 individuals [or 64.52%] who are residents of Puerto Rico) and who had bought a 50-year bi-annual or annual membership with the Meliá brand, and whose international benefits  were canceled as a result of the sale of Hotel Meliá

Puerto Rico to Coco Beach.

The class does not include employees or former employees of Club Meliá, their affiliates, directors or officers, the judges of the Puerto Rico General Court of Justice, or the attorneys of the parties.

3.6    Defendant **Meliá Hotels International, S.A.** ("Meliá International") is the parent company of and/or main shareholder of Sol Meliá, with main offices in Spain, which, either directly or through its agent, owns real property in Río Grande, Puerto Rico, issued in business transactions related to the hotel and timeshare industry. In sum, it is the parent company of Grupo Hotels Meliá International and/or Grupo Sol Meliá, and directly, jointly and severally liable for all the facts stated herein and for having orchestrated and authorized the sale of Hotel Meliá in Rio Grande and cancelation of the Plaintiff and class members SMVN memberships. Prior to June 1, 2011, Meliá International was named "Sol Meliá, S.A." It owns over sixty (60) subsidiaries and holding companies, and all management strategies related to the same are set and directly authorized by that parent company.

3.7    Defendant **Sol Meliá V.C. Puerto Rico Corp.** ("Sol Meliá") is a private corporation established by Meliá Internacional with main offices in Río Grande, Puerto Rico, organized under the Commonwealth of Puerto Rico, which, among other activities, is engaged in the sale of timeshares and provision of services in connection therewith in Hotel Meliá, Puerto Rico. Defendant is liable for the breach of the timeshare contracts in detriment of the rights of the class members.

3.8    Defendant   **Coco Condominium 1, LLC** ("Coco   Beach") is a private corporation with main offices in San Juan, Puerto Rico, incorporated in November 2018 only to enter the timeshare sales and related services industry. Defendant is liable as a corporation, in connection with the purchase of assets, interest and memberships owned by Sol Meliá in or about April 2019.  As a successor corporation, it is further jointly and severally liable for the obligations incurred and acts performed by

Sol Meliá and Meliá International.

3.9     Co-defendant John Doe Corporation is a private corporation incorporated under the laws of the Commonwealth of Puerto Rico or other. The Corporation agreed and conspired with the other co-defendants to stirp the Plaintiffs and class members of their rights and benefits secured under the agreement reached with Meliá Hotels International, S.A. and Sol Meliá V.C. Puerto Rico Corp.

3.10    Co-defendant Insurance Companies A, B and C are companies that issued insurance policies which cover the damages and liabilities caused by the co-defendants when they striped the Plaintiffs and class members of their rights and benefits secured under the agreement reached with Meliá Hotels International, S.A. and Sol Meliá V.C. Puerto Rico Corp.

3.11    Co-defendant Insurance Companies C and D are companies that issued insurance policies which cover the damages and liabilities caused by the John Doe Corporation.

IV.    **STATEMENT OF FACTS**

(A)    **The Meliá brand's arrival in Puerto Rico and the representations it made**

4.1     Plaintiffs re-allege and incorporate by reference each and every allegation previously set forth in this Class Action Complaint.

4.2     The timeshare/vacation club industry is a multi-billion dollar a year business in the United States. According to data provided by the American Resort Development Association, that industry exceeds 1,500 timeshare/vacation club resorts and 10 billion dollars in annual revenues.

4.3     Pursuant to the business model some resorts sell portions or blocks of their hotels off as timeshares/vacation clubs and generating billions of dollars in sales and financing profits, along with billions more from perpetual and ever-increasing maintenance fees and annual revenue.

4.4     Meliá International decided to come to Puerto Rico to do business, through Sol Meliá PR, and benefit from selling the class members $65,000,000.00 worth of Sol Meliá Vacation Club

11

memberships. Those *vacation ownership rights* granted the Plaintiff and class members rights to a certain number of assigned *SMOptions*, which worked as currency withing the Sol Melia Vacation Club and the SMVN.

4.5    Further, the *SMOptions* could also be converted to *MaS Points* which could be used to stay at Meliá Hotels and exclusive affiliate resorts in Europe and around the world.

4.6    In this case, Melia International and Sole Meliá PR's offer entailed the sale of *vacation ownership rights* that included certain rights-to-use interest in units of the Hotel Meliá in Rio Grande *and* the SMVN membership. Those right-to-use interests were not a typical timeshare arrangement based on the assignment of a particular unit/apartment at the "base hotel for a determined week," but rather a right to reserve a unit at the "home resort" or <u>any another</u> Sol Melia Vacation Club resort (Mexico, Dominican Republic, Spain, Panama, etc.) or Resort Collection (Costa Rica, Spain, etc.) and/or Urban Collection (Italy, France, etc.) resorts during a particular season based on the amount of *SMOptions* assigned to the member subject to the *vacation ownership rights* package he/she purchased (Platinum, Gold & Silver.)

4.7    Meliá International, is a Spain-based company primarily engaged in the hospitality sector. However, its activities are divided into three business segments: Hotels, Real Estate and Sol Meliá Vacation Club. The Hotels division administrates hotels under management and franchise agreements, operates own or leased hotels, as well as offers other entertainment activities, such as casino games and organized tours. The Real Estate division includes real estate development and operations. The Sol Meliá Vacation Club division operates vacation club complexes. The Company operates through numerous subsidiaries in Europe, the Americas, Africa and Asia.

4.8    Meliá International is a sophisticated publicly traded company (on the Spanish stock exchange). Although the Escarrer family owns the majority of the company's stock, in the year 2024,

some of its institutional shareholders included, *among others*, (i) The Vanguard Group, Inc. (1.78%), (ii) JPMorgan Asset Management (UK) Ltd. (0.82%), and (iii) BlackRock Fund Advisors (0.67%).

4.9     According to Meliá International *Consolidated Financial Statements for the Year ending on December 31, 2022*, between owned and joint-venture assets the company and its subsidiaries were valued at over 4.6 billion Euros.

4.10     As stated above, in or around the year 2004, Sol Meliá PR was established by Meliá International to allow the latter parent company to enter the Puerto Rico vacation ownership market.

4.11     Meliá International owns 100% of Sol Meliá PR. Every purchase of real estate, marketing campaign, business decision, negotiation and/or sale of services and/or real property related to Sol Meliá PR was authorized and executed by Meliá International. The sole purpose of Sol Meliá PR was to create profit and liquidity for Meliá International.

4.12     Meliá International provided its SMVN through Sol Meliá Vacation Network, a Luxembourg company. Meliá International is that Luxemberg company's parent company and owns or has a significant stake in the same.

4.13     Since the timeshare/vacation ownership rights industry is regulated in Puerto Rico by the Puerto Rico Tourism Company ("Tourism Company"), Meliá International and Sol Meliá filed a petition to secure a license to sell their Puerto Rico based Sol Meliá Vacation Club membership locally and abroad and place the Hotel Meliá in Rio Grande under a timeshare regime, pursuant to the *Timeshare and Vacation Club Act* (the "Timeshare Act"), P.R. Laws Ann. tit. 31, § 1251, *et seq*. The *Tourism Company* ultimately issued a license to sell *vacation ownership rights* to Sol Meliá PR.

4.14     During the licensing process, Meliá International issued various financial guarantees for shell companies working on its Hotel Meliá in Rio Grande project.

4.15    Further, when the codefendants filed their "Public Offering Statement Text" with the Tourism Company for approval, 31 L.P.R.A. §§ 1895-1898, they informed the Tourism Company and prospective buyers that the "Sol Meliá Vacation Club at Paradise Puerto Rico's" offerings were supported by <u>both</u> Meliá International and Sol Meliá. The very first paragraph of the public offering statement states:

> Experience in Resort and Leisure Industry. Sol Meliá VC Puerto Rico Corporation (SMVC) was organized on October 14, 2004. The SMVC's parent company Sol Meliá, S.A. (Sol Meliá) has been in the resort and leisure industry since 1956.

(*See*, Exhibit B, Public Offering Statement.) The documents only identify SMVC as a "service provider," not as the owner of the project or the *vacation ownership rights* offerings. Meliá International's intention was to bolster trust in the offering by using its own goodwill.[8]

4.16    Commencing in or around the year 2006, Sol Meliá PR and Meliá International began selling *vacation ownership rights* to the class members. According to Meliá International's *Consolidated Management Report and Annual Accounts* for the year 2006, revenues exceeded 1.3 billion dollars, and its profits increased by 51%. Specifically, Sol Meliá Vacation Club sales grew 70%.

4.17    Sol Meliá PR only operates to extend the life and in the benefit of its parent company, as a business tool to carry out the sale of the Sol Meliá Vacation Club memberships in Puerto Rico and abroad, where all the proceeds are eventually collected by Meliá International, *i.e.*, Meliá International is the final beneficiary of all actions of Sol Meliá.

4.18    Meliá International *incorporated* Sol Meliá PR in Puerto Rico and obtained its required certification from the Tourism Company as an entity authorized to sell and manage timeshares/vacation club services in Puerto Rico.

---

[8] Under the *Timeshare Act* developers are required to provide prospective owners with an offering statement delineating the terms and conditions that would govern a possible purchase as well as the rights and obligations that would arise once a purchase is closed. 31 L.P.R.A. §§ 1255-1255d.

4.19    However, Melia International and Sol Meliá PR did not establish the timeshare regimen for the "base hotel," as required by the *Timeshare Act*, until October 15, 2018, via Deed Number Fifteen (15), "Deed of Constitution of Vacation Property Regime Sol Meliá Vacation Club." *See*, *Scotia de Puerto Rico v. Burgos (In re Plaza Resort at Palmas, Inc.)*, 741 F.3d 269, 275 (1st Cir. 2014). All the Plaintiffs and class members' *vacation ownership rights* were purchased prior to the execution of that Deed of Constitution.

4.20    And in December of the year 2018, Meliá International, as Sol Meliá's principal stockholder, authorized, carried out and supervised the sale of Hotel Meliá in Rio Grande to Coco Beach LLC in order to unload its obligation and intentionally deprived the class members of their agreed upon Club Meliá membership benefits.[9]

4.21    Allegedly that sale occurred on March 29, 2019, by way of a *Deed of Purchase and Sale (Timeshare Parcel)*. However, Meliá International and Sol Meliá have kept hidden and have refused to provide Plaintiffs and the class members with a copy of an original private *Purchase and Sales Agreement* executed on December 24, 2018, which affected their rights. Viewing that latter document is essential. Upon information and belief, that December 24th document contains the **parent company guarantees** extended by Meliá International which the Plaintiffs and class members have never seen.

4.22    Meliá International is the owner of 100% of Sol Meliá PR and provides it with financial assistance. Melia International also masterminded, authorized, carried out and supervised the

---

[9]  Upon information and belief, Meliá International owns a stake and/or interest in Coco Beach Club LLC. Notably, the latter secured licensing from the Tourism Company to convert 90 units of the Hotel Meliá in Rio Grande into condo hotels, a sure real estate bet worth millions of dollars.

sale of the Hotel Meliá in Rio Grande to Coco Beach LLC to the detriment of its clients or consumers, the Plaintiffs of this action and class members, and the termination of their SMVN memberships.[10]

4.23    As stated above, *in the year 2016* Meliá International set in motion a corporate initiative to discontinue commercial activities in Puerto Rico and a new "Asset Management Strategy" which required it to <u>divest and sell-off</u> non-strategic assets *before the year 2020*, which including the Hotel Gran Meliá. That information and Meliá International's intentions are contained/shown in the company's *Consolidated Management Report and Annual Accounts* for the years 2016-2021.

4.24    The year 2016 was important because Melia International wanted to take advantage of the (i) positive cycle and significant increase in the value of beach front resort style real estate in Puerto Rico, due to Act 20/60 investors flocking to Puerto Rico and paying record prices for beach front real estate, and (ii) the significant increase in value of the US Dollar against the Euro. The change in currency exchange rates alone granted Melia International and the Escarrer family an extra 10% profit from the sale.

4.25    According to Meliá International *Consolidated Management Report and Annual Accounts* for the year 2019, it sold the Hotel Gran Meliá for more than $72,000.000.00, plus covering debt.

4.26    Between the sale of *vacation ownership rights* and the sale of the Hotel Gran Meliá, Meliá International and the Escarrer Family pocketed over $137,000,000.00. Meanwhile, the now <u>canceled</u> Sol Meliá PR allegedly has only $4,410,169.00 in assets. *See*, Fn. # 2 above. Considering that

---

[10]    Upon information and belief, Meliá International also owns a significant stake in Sol Meliá Vacation Network S.A.R.L., the Luxembourg company that owns the international vacation exchange and reservations services of SMVN and all Meliá hotels and resorts, including Hotel Meliá in Rio Grande. Upon information and belief, Meliá International owns that Luxembourg based company.

Sol Meliá PR has not filed any more "Annual Reports" with the Puerto Rico Department of State, it is possible that it may currently have no assets at all.

4.27    The Plaintiffs and class members add that it is essential to keep in mind that all proceeds received by Melia International and Sol Meliá PR from the sale of *vacation ownership rights* and the year 2019 sale of the Hotel Gran Meliá, may have been 90% tax free under Puerto Rico's Act 74 of June 10, 2010, known as the "Puerto Rico Tourism Development Act of 2010." Further, tax credits were surely also granted for the construction of Hotel Gran Meliá. Thus, while Meliá International defrauded all of the timeshare tourists that compose the class members and tarnishing Puerto Rico's image as a tourism destination, it was benefiting from local tax laws. Most of that money is currently is the Escarrer Family's pocket in Palma de Mallorca, Spain.

### (B)    The Meliá Brand's Offerings in Puerto Rico and Key Use of Words

4.28    Meliá International markets and sells *vacation ownership rights* to customers, such as the Plaintiffs and class members, as Sol Meliá Vacation Club memberships (rebranded "Club Meliá" in the year 2021).[11] Potential customers and class members were courted to make purchases as follows:

> From our family to yours, it is my pleasure to welcome you to Sole Meliá Vacation Club, a prestigious **vacation membership concept** from Sol Meliá Hotels and Resorts, one of the most trusted hospitality companies in the world.
>
> For nearly 50 years our name has been synonymous with gracious service, deluxe accommodations and the world's most desirable vacation spots. Our internationally acclaimed hotel resort family spans the globe with 350 properties in 30 countries on five continents, and includes Meliá Hotels and Resorts, Sol Hotels and Resorts, Tryp Hotels, Hard Rock Hotels and Paradisus Resorts.
>
> And now, as a member of Sole Meliá Vacation Club, you can experience the vacation of your dreams while savoring all the comforts and conveniences of home. **Membership is your ticket to a world of unparalleled vacation choices…return to your home resort or explore thousands of global options with our flexible vacation exchange program available through the SMVNetwork.**

---

[11] Since the year 2021 Meliá International has used the shorter term "Club Meliá" to market *vacation ownership rights*.

(*See*, Exhibit A, Letter by Gabriel Escarrer Julia (2004) Chairman of Sole Meliá Hotels International.) (Emphasis added.) That letter was filed with the Tourism Company during the process of petitioning licensing to place its Hotel Meliá in the Río Grande project under a timeshare regime pursuant to the *Timeshare Act*. The same letter was provided to the Plaintiffs and class members.

4.29    The Hotel Gran Meliá is an approximately 579-room resort property. However, the "home resort," which according to the contracts executed was part of the Hotel Gran Meliá, was merely identified as "certain units dedicated for vacation club use ("Units") located in the tourism project identified as Sol Meliá Vacation Club at Grand Meliá Puerto Rico." According to documents filed with the Tourism Company it entailed 108 units dedicated to club members. The Hotel Gran Meliá's common areas, restaurants, pools, golf course, beach and other amenities were <u>all</u> available to the club members.

4.30    It is noteworthy that Meliá International uniformly uses the terms "Sol Meliá" and "Sol Meliá Vacation Club" in <u>all</u> of its advertising, promotions and offers to <u>intentionally instill</u> upon the prospective purchaser and the class members that they are always doing business with Meliá International and becoming members of its worldwide network of hotels and resorts. Such careful drafting and promotion are intentional and were relied on by the Plaintiffs and class members.

4.31    Meliá International and Sol Meliá PR offered and promoted their *vacation ownership rights* packages using its luxurious Hotel Meliá in Rio Grande as the "home resort" and its SMVN. In the beginning the "home resort" was at the all-inclusive Paradisus Hotel by Meliá. It was subsequently converted and rebranded as Hotel Gran Meliá. Notably, "Gran Meliá" being Melia International's luxury brand.

4.32    In the year 2005, Sol Meliá PR began formally promoting and offering to consumers the purchase of *vacation ownership rights* as 50-year memberships to Sol Meliá Vacation Club, with

Hotel Meliá in Rio Grande as the "home resort" hotel. Sol Meliá Vacation Club membership's key component was membership in the SMVN and being beneficiaries at all clubs and affiliates of Meliá International worldwide.

      4.33    As previously stated, the SMVN is one of the most coveted benefits in the timeshare/ vacation club industry and a main attraction for any *vacation ownership rights* purchaser since it grants purchasers the full "Meliá experience." Considering that offering, Plaintiffs and the class members eagerly executed *vacation ownership rights* agreements and others, and paid Sol Meliá PR the purchase price and membership fees demanded.

      4.34    The class members relied on the fidelity of the representations and offers made by Sol Meliá International and Meliá PR's sales staff, and paid the sums demanded by said co-defendants to purchase their *vacation ownership rights* and thus Sol Meliá Vacation Club memberships. The class members also rightfully relied on Meliá International's reputations at the time of making their purchases. At all times, the sales staff represented to the Plaintiffs and class members that they worked for Meliá International via Sol Meliá Vacation Club.

      4.35    In sum, said purchases granted the Plaintiffs and class members (i) contractual ownership, use and enjoyment of their vacation club/timeshares memberships in the Hotel Meliá in Rio Grande, plus (ii) SMVN benefits at all clubs belonging to the Sol Meliá Vacation Club exchange program and affiliates of Meliá International around the world. Thanks to the *SMOption points* concept, the Plaintiff and the class members could stay at any of hundreds of hotels and resorts rather than stay at their "home resort" hotel. (*See*, Exhibits C & D.)

4.36    Some examples were:



Said flyer was provided to all of the Plaintiffs and class members by Meliá International's sales staff and Sol Meliá PR at the time of purchase to show them the extent of the Sol Meliá Vacation Club resorts inventory.

4.37    The class members also rightfully relied on the fact that the Sol Meliá Vacation Club network includes more than 30,000 members distributed among all its "home resort" hotels around the world.

4.38    The available *vacation ownership rights* packages were either Platinum or Gold plans, and they also depended on the type of unit/room the class members wanted at the "base resort" hotel. The Platinum package granted 38,000 *SMOptions* and the Gold package 36,000 *SMOptions*.

4.39    The Plaintiffs and class members paid an average of $18,500.00 to $57,600.00 for their *vacation ownership rights*. The purchase price depended on the year of purchase, season chosen (Platinum or Gold), unit/room type (1 bedroom suite or masters suite, 2 bedroom or 3 bedroom) and the amount of *SMOptions* assigned.

4.40    Besides paying the purchase prices, their *vacation ownership rights*' agreements also required the class members to (i) pay yearly maintenance fees assigned by Sol Meliá PR for their "home resort" at Hotel Meliá in Rio Grande, and (ii) all annual fees related to their memberships in Sol Meliá Vacation Club's exclusive SMVN. Such fees amounted to approximately $1,000.00 a year.

4.41    In the year 2011, there were 2,956 members and Sol Meliá PR only had approximately 42 units of the vacation club in use and available, while pocketing $2,956,000.00 in yearly fees.

4.42    In sum, the SMVN allowed the Plaintiffs and class members to go on vacation around the world and stay at Meliá Hotels and/or affiliates, among other benefits. As Meliá International admitted and acknowledged on its website:

> Through the Club Meliá Network, members HOME Resort purchase is backed up and converted to a currency called Options. With Options, members can break their vacation time into smaller trips, or add time together for an expanded vacation, as well as to access additional vacations resorts, and products such as additional worldwide resorts, and products such as additional worldwide resorts, cruises, car rental, airfare and other travel services. **Through the Club Meliá Network, members can have access:  Other Club Meliá HOME RESORTS, a group of high demand destinations called the "Resort & Urban Collection", the more than 350 Meliá Hotels & Resorts, over 4,000 affiliated vacations resorts worldwide, and additional Network Partners travel opportunities such as cruises.**

(Emphasis added).

4.43    Clearly Meliá International and Sol Meliá PR were offering the Plaintiffs and class members much more than just access to the Hotel Meliá in Rio Grande. They offered, in exchange for

significant fees paid, that the Plaintiffs and class members would be able to enjoy the Hotel Meliá "home resort," as well as the Meliá brand's international exchange network for **a term of 50 years.**

(C)    **Some of Meliá International's sale staff's tactics and representations**

4.44    Meliá International and Sol Meliá PR's sales staff used different venues to hold presentations and sales meetings with potential customers that they aimed to sell *vacation ownership rights* to, including the Plaintiffs and class members. Those venues were luxuriously decorated with photographs and posters of Melia International's worldwide resorts and hotels. The Condado and Hotel Gran Meliá venues had a minimum of thirty (30) sales staff members.

4.45    All of the marketing was aimed at offering and selling the Plaintiffs and class members membership in the Meliá International concept, formally marketed as Sol Meliá Vacation Club membership. In fact, Sales Staff provided Plaintiffs and class members with luxurious binders **which laid out the hundreds of travel options** they had available based on the purchase of their *vacation ownership rights*. (*See*, Exhibit E, Selected content of the binder.)

4.46    As a perk to get some unsure Plaintiffs and class members to purchase the *vacation ownership rights* offered, sales staff also offered an add a bonus of automatic "MaS points" which the class members could use at <u>any</u> Meliá International hotel around the world. Only Meliá International directly could offer that perk. Sol Meliá PR had no such authorization.

4.47    Sales staff explained and represented to the Plaintiffs and class members that upon executing the Vacation Purchase Agreement ("VPA") they would be granted access to both the "home resort" hotel and the SMVN. The Sales Staff stated that executing the VPA with a "home resort" at Hotel Meliá in Rio Grande automatically caused them to be enrolled in the SMVN. In fact, Sales Staff provided Plaintiffs and class members with luxurious binders **which laid out the hundreds of travel options** they had available based on the purchase of their *vacation ownership rights*.

4.48    Upon executing the VPA and the Network Services Agreement ("NSA"), the Plaintiff and class members could now choose to enjoy their vacations at the "home resort" at the Hotel Gran Meliá, or any other Sol Melia Vacation Club resort (Dominican Republic, Mexico, etc.), besides any hotel or resort where the SMVN had properties. As some Plaintiffs have explained, executing the VPA opened the "door" to the SMVN.

4.49    The sales staff offered and represented to the Plaintiff and class members that the *vacation ownership rights* were "one product" that thanks to *SMOptions* granted them access to both the "home resort" hotel and the SMVN. Subject to those representations the Plaintiffs and class members signed four (4) contracts.

4.50    The sales staff never offered or even suggested to the Plaintiffs and class members that an option could existed whereby they could sign only the VPA and exclude signing the NSA in order to have access solely to the Hotel Meliá in Rio Grande and not the SMVN. That was simply not possible because what was being sold was a *vacation ownership rights* package and not a traditional timeshare concept.

4.51    Further, the sales staff repeatedly emphasized to the Plaintiffs and class members that the *vacation ownership rights* package they were purchasing was for the term of fifty (50) years. According to the sales staff, that meant access to both the "home resort" hotel and the SMVN for fifty (50) years.

4.52    The sales staff's encounters and sales efforts with the Plaintiffs and class members on many occasions lasted more than two (2) hours and explanations were thorough, including representations that the entire package purchases had a term of fifty (50) years.

4.53    During the thirteen (13) years that Sol Meliá and Meliá International honored the Plaintiffs and class members *vacation ownership rights* may <u>never</u> stay even once at the Hotel Meliá

23

in Rio Grande. Every single yearly vacation was taken at a Sol Meia Vacation Club resort or network resort outside of the United States. That was the beauty of the product.

4.54    The sales staff followed Meliá International's instructions and ensured that the Plaintiffs and class members believed that they were <u>always</u> doing business with Meliá International, the trusted and powerful luxury brand. As a matter of example, all business cards stated Sol Meliá Vacation Club (not Sol Meliá PR), and their e-mails and the webpage addresses (www.smvc.com) suggested Meliá International. (*See*, Exhibit J, Business Card)

4.55    Meliá International made sure that its sales staff projected and represented to the Plaintiffs and class members, and other potential customers for that matter, that Sol Meliá Vacation Club and Meliá International were one and the same.

4.56    Never did any sales staff member inform or instruct the Plaintiffs or class members that their *vacation ownership rights* could or would be cancelled or transferred to any third party. At all times they represented that the Plaintiffs and class members with Meliá International and Sol Meliá Vacation Club would last fifty (50) years.

**(D)    The Contracts which Perfected the Sales of *Vacation Ownership Rights***

4.57    Plaintiffs and class members also relied on the contracts they had before them when they were offered and ultimately purchased their *vacation ownership rights*.

4.58    At the time Meliá International and Sol Meliá PR sold the memberships to the Plaintiffs and class members, its staff handed them four (4) previously drafted adhesion contracts titled (i) Vacation Purchase Agreement ("VPA"), (ii) Network Services Agreement ("NSA"), (iii) Acknowledgements & Understandings ("A&U") and (iv) summary and description of vacation right ("VR"), all of which were executed by the class members. (See, Exhibis D, E & F.)

4.59    Besides executing those four (4) contracts, and as stated above, Melia International and Sol Meliá PR also provided them with a package of promotional flyers and a luxurious brochure binder which outlined all the offerings and opportunities that the class members could enjoy and use under their Sol Meliá Vacation Club membership and its exclusive SMVN (hotels, cruises, air lines and car rentals).

4.60    Those four (4) contracts made up the agreement that governed the relationship between the parties. In fact, Meliá International and Sol Meliá PR structured the offerings and promotions based on those *vacation ownership rights* contracts, flyers and luxurious brochure binder, and the class members relied on them when deciding to purchase their vacation club memberships. Said document did not provide any kind of notices as a potential sale or transfer of the vacation club/timeshare hotel or *vacation ownership rights* by Meliá International or Sol Meliá PR before the fifty (50) year term had elapsed.

4.61    The VPA is the agreement that granted the class members ownership of their *vacation ownership rights*, instituting the Hotel Meliá in Rio Grande as their "home resort". The NSA is the agreement that granted the class members access to Sol Meliá Vacation Club's exclusive SMVN. Meanwhile, the A&U is the agreement pursuant to which Meliá International and Sol Meliá PR represented to the class members all of the benefits that they were receiving and the obligations which they would incur when purchasing their Sol Meliá Vacation Club membership. And the VR explained to the class members in detail the process by which *SMoptions* were to be used within the SMVN.

4.62    The VPA states the following as regard the term of the agreement:

FOURTH. TERM OF AGREEMENT. Unless previously terminated as more particularly set forth herein, the AGREEMENT shall expire upon the earlier of (a) the end of fifty (50) USE YEARS from the date when Member is entitled to the first Use Period of the Unit, or (b) the end of fifty (50) USE PERIODS, or the end of TWENTY-FIVE (25) USE PERIODS if Member has acquired alternat-year rights; consequently, MEMBER expressly recognizes that he or she shall not have any right whatsoever to use or enjoy the Units, or areas of the Home Resort, beyond the aforementioned term expiration.

(*See*, Exhibit F, VPA contract.)

25

4.63    The NSA clearly states that upon initial enrollment in the SMVN, the Plaintiffs and class members "shall have entered into a fully enforceable and binding contract with SMVN." Notably, that SMVN contact was not with Sol Meliá PR. (*See*, Exhibit G, NSA contract.)

4.64    Further, the A&U states the following in its relevant parts:

"The undersigned buyers have this day entered into a Vacation Purchase Agreement for vacation lodging services with Service Provider. In connection with said purchase, and to ensure member satisfaction, **buyers acknowledges that the items below have been fully disclosed and explained**. (Please initial each line).

1. **We understand** that we purchased the following vacation club interests in the Sol Meliá Vacation Club at Gran Meliá P.R.
…

3. **We understand that our purchase includes an affiliation to an internal exchange system with the name Sol Meliá Vacation Network (SMVN), through which we will have access to a Collection of Resorts, MaS Program, Network Partners, External Exchange Program, and other services.**

…

5. We understand that the term of our Membership is for 50 years (25 years for alternative year, if applicable) from our first use year.

(*See*, Exhibit H, A&U contract.) (Emphasis added).

4.65    Notably, none of the four (4) adhesion contracts include language granting Meliá International or Sol Meliá PR the right to cancel, terminate or transfer the contracts. Neither do they include language suggesting or allowing them to cancel, terminate or transfer the class members SMVN membership. The lack of such language is telling since such clauses are standard in most timeshare or vacation right industry contacts.

**(E)    Sol Meliá International carefully crafted its contacts to create an image**

4.66    The timeshare industry is notorious for scamming consumers and by the late 2000's potential purchasers had become knowledgeable and suspicious of any offers that seemed too good to

be true. Meliá International, aware of consumers' skepticism about the industry, drafted the VPA, NSA, A&U and VR in a manner that seemed fair to the Plaintiffs and class members who read the contracts. They had been drafted to appear to level the business relationship between the Meliá brand and the consumer and *de facto* did.

4.67    As an example, and as previously stated *in part*, the four (4) contracts are devoid of (i) unilateral cancelation or termination clauses, (ii) transfer clauses releasing Meliá International or Sol Meliá PR and/or even of arbitration clauses in favor of Meliá International or Sol Meliá PR, and/or their principals and/or affiliates. The exclusion of that style of clauses was rare since one-sided clauses granting providers "significant advantages" over consumers are standard in the timeshare and most other industries.

4.68    Notable, and important to this case, the four (4) contracts are also devoid of a force majeure clause.

4.69    Based on Meliá International' reputation and the language contained in those four (4) contacts, which did not contain clauses which could serve to divest them from their *vacation ownership rights*, consumers, including the Plaintiffs and class members, were willing to pay premium prices for Sol Meliá Vacation Club membership and <u>all</u> maintenance and other fees required under the executed contracts. That besides financing costs in the majority of the cases.

4.70    In sum, based on the business terms included in the contract, Plaintiff and class members trusted that purchasing their *vacation ownership rights* and entering a long term fifty (50) year contract with Meliá International and Sol Meliá PR was a safe business decision for them and their families.

4.71    Unbeknownst to the Plaintiff and class members, although Meliá International and the Sol Meliá PR brand had successfully cultivated that positive reputation, in the case of their Puerto Rico

project their intentions were no different from other unscrupulous timeshare industry developers. Meliá International and the Escarrer Family were willing to breach any contact for the sake of creating additional liquidity for both.

6.72    The only difference was that the Sol Meliá International would choose to try securing its "significant advantages" over consumers by trying to shield itself behind shell companies and misrepresentations rather than *via upfront* (i) unilateral cancelation or termination clauses, (ii) transfer clauses releasing Sol Meliá and/or even of arbitration clauses. At all times Meliá International has used Sol Meliá PR as a conduit entity.

4.73    And by using the basic terms (i) Sol Meliá and (ii) Sol Meliá Vacation Club in <u>all</u> of its promotions, presentation and offering, it Meliá International intentionally created the image that business dealing, and memberships purchases were made directly with it and its brand, while hiding its true intentions and the fact that shell companies were involved. Such intentional material misrepresentations mislead the Plaintiff and class members to believe that the offerings and the sale of the *vacation ownership rights* object of this lawsuit were business dealings with Meliá International, the billion dollar international company that Gabriel Escarrer Julia, Chairman of Sol Meliá Hotels International, stated that "[f]or nearly 50 years…has been synonymous with gracious service, deluxe accommodations and the world's most desirable vacation spots."  (*See*, ¶ 4.28 above.)

4.74    The co-defendants' representations and filings before the Tourism Company also led that government entity, and by extension the public, to believe that it was Meliá International which was developing and selling the *vacation ownership rights* object of this lawsuit with its "base hotel" at Hotel Meliá in Rio Grande.

4.75    Fortunately, the VPA, NSA, A&U and VR establish the Plaintiffs and class members *vacation ownership rights* which could not be unilaterally infringed, transferred or terminated by the co-defendants.

**(F)    The contracts which caused the *vacation ownership rights* were not fractionable**

4.76    Sol Meliá PR as the Hotel Meliá in Rio Grande owner and "Service Provider" sold *vacation ownership rights* to the Plaintiffs and class members which are <u>not</u> fractionable under contracts executed by the parties.

4.77    Pursuant to the VPA, Sol Meliá PR sold right-to-use interests ("RTU") in certain units of the Hotel Meliá in Rio Grande. And prior to selling said RTUs, Sol Meliá PR had executed a *Sol Meliá Vacation Network Affiliation Agreement* with Sol Meliá Vacation Network S.A.R.L., a Luxembourg company, to cause Hotel Meliá in Rio Grande to become a network resort. As a result, all the hotel's vacation lodging accommodations and each *vacation ownership rights* purchaser (Plaintiffs and the class members) would become network members with the ability to exchange his or her rights to use the "home resort" to access other accommodations available through the SMVN. The currency that allowed the exchanges was *SMOptions*.

4.78    Pursuant to the VPA, since affiliation with the SMVN occurred <u>prior</u> to the Plaintiffs and class members' purchases of *vacation ownership rights*, Sol Meliá PR was obliged to enroll the purchasers as members of the SMVN. Said membership under the VPA was <u>mandatory</u> and Sol Meliá served <u>solely</u> as an "agent" to enroll the new participant. Enrollment of Plaintiffs and the class members in the SMVN occurred as to 100% of cases were VPAs were executed and Sol Meliá Vacation Network S.A.R.L. accepted all of those members enrollment in the exchange network.

4.79    Enrollment required the execution of the NSA and pursuant to that agreement Plaintiff and the class members "entered into a fully enforceable and binding contract with SMVN." Being that

agreement a contract between the Plaintiff and class members and Sol Meliá Vacation Network S.A.R.L., Sol Meliá PR as merely an enrolment "agent" had <u>no</u> authority to terminate the same.

4.80    To date, Plaintiffs and the class members have not received any notice from Sol Meliá Vacation Network S.A.R.L. terminating that agreement or their SMVN memberships.

4.81    Since enrolment in the SMVN was mandatory under the VPA and the Plaintiffs and class members diligently paid their SMVN membership fees, Sol Meliá Vacation Network S.A.R.L. nor Sol Meliá PR had the authority to affect or fraction their *vacation ownership rights*. To do so would completely change the nature of the purchases under the VPA and it was well known that the main asset of the *vacation ownership rights* was SMVN membership.

4.82    On December 3, 2004, <u>prior</u> to constructing the Hotel Meliá in Rio Grande, Meliá International and Sol Meliá PR requested via letter a permit to commence selling *vacation ownership rights* to consumers.  The letter stated that the *vacation ownership rights* they offering for sale were principally comprised of the SMVN. Further, in order to provide comfort to the Tourism Company that they would not swindle consumers and assure that a permit would be issued, they represented that "**[i]f by any chance the Sol Meliá Vacation Club at Paradisus Puerto Rico is not build and operational by June 2006, the Members who pre-bought would be in no manner affected or prejudiced because (as explained in the offering document) their Vacation Lodging Rights would be honored at accommodations to be provided through the Network at the Paradisus Puerto Rico Resort**." (Emphasis added). In other words, they would always have the benefit of the SMVN.

4.83    At all times Meliá International vouched and expressed that it would provide financial guarantees for the Sol Meliá Vacation Club project. Those representations were made to the Tourism Company and relied upon by the Plaintiffs and class members. Such representations, combined with Meliá International's savvy marketing of Sol Meliá Vacation Club membership led the Plaintiffs and

class members to rightfully believe that they were doing business with Meliá International. That was Meliá International's intention all along and it trained its sales staff to project the same.

**(G)    The Co-defendants Breached the Agreements**

4.84    The Vacation Club at the Hotel Meliá in Rio Grande was allegedly sold for a mere $11,359,999, while the individual units are worth tenth of millions of dollars if sold individually as beachfront condos. It was Melia International who *de facto* sold the same. Further, it also sold the Hotel Gran Meliá for over $72,000,000.00.

4.85    Hurricane Maria struck Puerto Rico in September of the year 2017, and after the storm Sol Meliá intentionally kept the Hotel Meliá in Rio Grande closed. In fact, the hotel never resumed operations under the Meliá brand, although the co-defendants continued to charge the class members all maintenance and other fees required under the four (4) aforementioned executed contracts.

4.86    Unbeknownst to the Plaintiffs and class members, in late year 2018, Meliá International, individually, together with and through Sol Meliá PR, sold the Hotel Meliá in Rio Grande to Coco Beach LLC and cashed-out all of its interests in that "home resort" hotel.

4.87    On December 3, 2004, Meliá International and Sol Meliá PR represented to the Tourism Company that 108 out of 453 units of Hotel Meliá in Rio Grande would be sold under its vacation club project, each room with an expected occupancy rate of 51 weeks. However, in the year 2016 Meliá International decided to discontinue business in Puerto Rico. So, the *vacation ownership rights* sold in this case totaled $65,000,000.00. only about 42 units were utilized. Most, if not all such proceeds were ultimately received by Meliá International as profits. Thus, cashing-out left Meliá International significantly wealthier.

4.88    However, and as stated above, Meliá International financed the purchase price of the *vacation ownership rights* for most of the Plaintiffs and class members for the term one hundred and

twenty (120) months at between 13% and 14% interest rates, plus closing costs. By combining the sales price with the financing charges, Meliá International was able to double its sales income to approximately $140,000,000.00. Obviously, that also doubled Meliá International and the Escarrer family's profits.

4.89    In or around April 2019, the class members were given first notice that Hotel Meliá in Rio Grande had been sold to Coco Beach LLC.

4.90    That contractually unauthorized sale and the loss of their Meliá flagged home resort hotel significantly diminished the resale value of the Sol Meliá Vacation Club *vacation ownership rights*.

4.91    To Plaintiffs and the class members surprise, besides selling the "home resort" hotel, Meliá International and Sol Meliá PR and also canceled <u>all</u> the class members' SMVN benefits and stripped them from any and all benefits to which they were previously entitled to under the Meliá brand. I sum, based on Meliá International and Sol Meliá PR's breach, the Sol Meliá Vacation Club memberships they purchased ended.

4.92    On July 3, 2019, triggered by the class members inquiries and voiced dissatisfaction with the sale of the hotel to Coco Beach LLC, Sol Meliá notified that, in fact, it had unilaterally extinguished the class members' Sol Meliá Vacation Club benefits as follows:

> "The term of the purchase and sale agreement with the new owner establishes the new owner's obligation to fully comply with all contractual obligations towards the Club Meliá members contained in their respective contracts," "Since the new owner is not part of Meliá Hotels International, the vacation club will not be affiliated with the Meliá Vacation Network."

4.93    Further, by that date, the Hotel Meliá in Rio Grande was also subject to the Vacation Property Regime under the terms and conditions of Law 204 pursuant to that certain *Deed Number fifteen (15) Deed of Constitution of Vacation Property Regime Sol Meliá Vacation Club*, executed on

October 15, 2018, before notary Maria Fernanda Archeval. The execution of that deed was ordered by Meliá International in order to allow it to sell its Sol Meliá Vacation Club at Hotel Gran Meliá. Notably, the *Deed* sought to change terms contained in the contacts executed between the parties to benefit Meliá International.

4.94    The loss of the coveted SMVN benefits entailed an unacceptable breach of trust and duty towards the class members, since owning a membership under the Meliá brand and enjoying its worldwide network was the main reason for the purchases.

4.95    Further, if the sale of the "home resort" hotel causes a loss in the resale value of those *vacation ownership rights*, the cancellation of the attached Sol Meliá Vacation Club benefits rendered their *vacation ownership rights* essentially worthless for resale.

4.96    The Plaintiffs and class members would not have purchased the vacation club had it not been for the Sol Meliá Vacation Club benefits which SMVN membership granted. Likewise, had the VPA, NSA, A&U and VR even suggested that the class members could be stripped of their SMVN membership, they would not have consummated the purchases nor would they have agreed to pay top dollar for such *vacation ownership rights*.

4.97    Notably and adding to Meliá International and Sol Meliá PR and bad faith, while they kept Hotel Meliá in Rio Grande closed for almost two (2) years and were concocting their plan to swindle the Plaintiffs and class members out of their purchased *vacation ownership rights*, they were also continuing to reap all the fees they could from Plaintiffs and class members under the executed contacts.

4.98    As stated above, that plan to swindle the Plaintiffs and class members was set out by Meliá International and the Escarrer Family in the year 2016, as set forth in Meliá International *Consolidated Management Report and Annual Accounts* for the years 2016-2021.

4.99    Upon information and belief, the co-defendants falsely represented to the Tourism Company that Coco Beach, the purchasing entity, would be offering the Plaintiffs and class members the same benefits that they had been receiving under the Meliá brand. Such representations entail false representations to the regulating entity.

4.100   Lastly, the sale of the Hotel Gran Meliá was really immaterial to the *vacation ownership rights*, since even Meliá International and Sol Meliá PR had represented on December 3, 2004, "[i]f by any chance the Sol Meliá Vacation Club at Paradisus Puerto Rico is not build and operational by June 2006, the Members who pre-bought would be in no manner affected or prejudiced because (as explained in the offering document) their **Vacation Lodging Rights would be honored at accommodations to be provided through the Network** at the Paradisus Puerto Rico Resort." In other words, the SMVN benefits were not contingent upon the "home resort" being at Hotel Gran Meliá.

**(H)    Meliá International's direct conduct and its Real Estate division**

4.101   According to Mr. Angel Luis Rodríguez Mendizabal ("Mr. Rodríguez Mendizabal"), who was the *Portfolio Management Vice President Real Estate of Meliá International*, at the time the Plaintiffs and class members *vacation ownership rights* were canceled, Meliá International owned the majority of Sol Meliá PR and was the sole shareholder of Spanish and Dutch companies that owned the Hotel Meliá in Rio Grande resort. That information was provided by Mr. Rodríguez Mendizabal under penalty for perjury. (*See*, Exh. I ¶¶ 1, 25 & 26, Declaration by Mr. Rodríguez Mendizabal.)

4.102   He has been a Meliá International employee in Palma de Mallorca, Spain, since the year 2004.

4.103   According to Mr. Rodríguez Mendizabal, Meliá International voted to sell the "timeshare building" that Hotel Meliá in Rio Grande to which the Plaintiffs and class members *vacation ownership rights* were assigned. (*Id.* ¶ 1)

4.104   Further, Mr. Rodríguez Mendizabal and his fellow Meliá International co-employee, Mark Hoddinott, executed <u>all</u> documents related to the cancelation of the Plaintiffs and class members' *vacation ownership rights* and the sale of the Hotel Meliá in Rio Grande. (*Id*. ¶ 32)

4.105   Meliá International, through Mr. Rodríguez Mendizabal and Escarrer Family members, designed the plan to sell the Hotel Gran Meliá and breach all the agreements with the Plaintiffs and class members in order to cancel their agreed upon *vacation ownership rights*.

4.106   Upon information and belief, Mr. Rodríguez Mendizabal personally courted and negotiated with the investor who ultimately purchased the Hotel Gran Meliá, on Meliá International behalf.

4.107   At the time Meliá International and Sol Meliá PR canceled the Plaintiffs and class members *vacation ownership rights* and sold the units of Sol Meliá Vacation Club at Hotel Gran Meliá, Meliá International issued a parent company guarantee as guarantor to the obligations that Sol Meliá PR owed to the purchaser, *to wit*, Coco Condominium 1 LLC. Specifically, and according to Mr. Rodríguez Mendizabal, Meliá International issued a guarantee to cover "indemnification claims" filed against Coco Condominium 1 LLC, and possibly Sol Meliá PR. (*Id*. ¶ 33) Upon information and belief, said parental guarantee covers <u>all</u> claims filed by the Plaintiffs and class members. Notably, the first-Class Action Complaint related to the facts alleged in this Complaint was filed in the year 2019, and said claims remain alive. Thus, said parent company guarantee is still effective.

4.108   Further, according to Mr. Rodríguez Mendizabal, at the time the Plaintiffs and class members *vacation ownership rights* were canceled, Meliá International keeps all its subsidiaries and affiliates covered under its umbrella insurance policy. (*Id*. ¶ 21) That included Sol Meliá PR. Meliá International does so to receive all insurance claim payments related to insurance claims filed by its subsidiaries and affiliates. Meliá International pockets them.

4.109   Upon information and belief, Meliá International received the insurance proceeds claimed for damages to the Hotel Meliá in Rio Grande and/or to Sol Meliá PR related to Hurricane María striking the island. That included all business interruptions and physical damage caused to the Hotel Meliá in Rio Grande and/or vacation club. Despite that, Meliá International and Sol Meliá PR continued to charge the Plaintiffs and class members all maintenance and other yearly charges.

4.110   Note that the sale of the "timeshare building" at the Hotel Gran Meliá was sold via a *Purchase and Sales Agreement* executed on December 24, 2018, but it was not until March 29, 2019, by way of a *Deed of Purchase and Sale (Timeshare Parcel)*, that the sale became public. And it was not notified to the Plaintiffs and class members until April 25, 2019 -- enough time to have them pay their yearly fees which were due on January 1st of every year.

4.111   Further, as stated above, Meliá International consciously chose to discard the Plaintiffs and class members right and breach its and Sol Meliá PR (its conduit company) agreements with them in order to cash out on its Puerto Rico investment, just thirteen (13) years into a fifty (50) year agreement. Meliá International plan commenced in the *year 2016* when it set in motion a corporate initiative to discontinue its commercial activities in Puerto Rico and a new "Asset Management Strategy" which required it to divest and sell-off non-strategic assets *before the year 2020*, which included the Hotel Gran Meliá.

4.112   Further, Melia International wanted to take advantage of the (i) positive cycle and significant increase in the value of beach front resort style real estate in Puerto Rico, due to Act 20/60 investors flocking to Puerto Rico and paying record prices for beach front real estate, and (ii) the significant increase in value of the US Dollar against the Euro. The change in currency exchange rates alone granted Melia International and the Escarrer family an extra 10% profit from the sale.

4.113   In sum, Meliá International to take over and use Sol Meliá PR to breach the Plaintiffs and class members rights and harm the vacation club tourism image of Puerto Rico, while reaping tax credits and tax benefits.

4.114   Meliá International and Sol Meliá PR never notified the Plaintiffs and/or class members of that initiative to discontinue commercial activities in Puerto Rico or of that "Asset Management Strategy" to sell-off all real estate assets in Puerto Rico. Had the Plaintiffs and class members known that plan or even of its possibility they would not have purchased their Sol Meliá Vacation Club membership.

4.115   Further, the time window that Meliá International chose was key to creating significant additional liquidity for both Melia International and the Escarrer family, the latter of which was involved in a family succession plan during that period and, upon information and belief, required cash on hand for family members. In sum, Meliá International canceled the Plaintiffs and class members' *vacation ownership rights* to save money and cash out its Puerto Rico real estate hoping not to have any further obligations towards the families it had charged upwards of $170,000,000.00 in purchasing price and financing fees.

4.116   Meliá International engaged in that blatant conduct with the intention of later trying to hide behind its shell companies, *to wit*, Sol Meliá PR and Desarrolladora del Norte S. en C. S.A. ("Dessarrolladora S.A."), in the event that suit was filed against it for the breaches discussed in this Complaint. However, the truth is that Meliá International arrive in Puerto Rico and has conducted business, provided guarantees, provided insurances under is umbrella, reaped immense profits, benefited from tax breaks and incentives, and even appeared before the Courts of Puerto Rico to fight a local hotel in Ponce for the right to use the name "Meliá." In sum, Meliá International has flouted

37

its financial power and reaped all that it could while disregarding the right of those who benefited them.

4.117   Meliá International direct conduct in Puerto Rico and affecting the Plaintiffs and class members as described above is unacceptable. Further, Meliá International conduct and use of Sol Meliá and Dessarolladora S.A. as mere conduit entities breach agreements with the Plaintiffs and class members justifies the piercing of both entities' corporate veils.

4.118   The purpose of Meliá International blatant conduct, to create liquidity for it and the Escarrer Family.

   **(I)    Coco Beach LLC and Meliá International's conduct**

4.119   Coco Beach LLC and Meliá International knew about the VPA, NSA, A&U and other contracts subscribed between Sol Meliá and the class member, nevertheless, they chose to intentionally interfere with those contracts with the end result being that the "home resort" hotel was sold to Coco Beach LLC without a Meliá flag, and Sol Meliá PR and Meliá International canceled all the class members' SMVN memberships and stripped them from any and all benefits to which they were previously entitled to under the Sol Meliá Vacation Club and/or Meliá brand. Such effects were foreseeable and known the Coco Beach LLC and Meliá International.

4.120   Coco Beach LLC and Meliá International negotiated the sale of Hotel Meliá in Rio Grande all while the "home resort" hotel remained closed after Hurricane Maria. They also knew that Sol Meliá would not reopen the vacation club hotel. Nonetheless, they conspired to keep the hotel closed while Sol Meliá and Meliá International continued to charge the class member fees subject to the four (4) executed contracts. All to the detriment of the class members.

4.121   Coco Beach LLC and the investors who back it new that Meliá International intended to cancel the Plaintiffs and class members *vacation ownership rights* and that their purchase would

precipitate that termination. However, Coco Beach LLC was more interested in securing 93 units in the "home resort" for sale as condos than in the Plaintiffs and class members rights. It was also considering the tax benefits that it would receive to sell those units, which upon information and belief was 90% tax free.

    4.122   The case can be summarized in two (2) Sol Meliá statements:

> "And now, as a member of Sol Meliá Vacation Club, you can experience the vacation of your dreams…Membership is your ticket to a world of unparalleled vacation choices…return to your home resort or explore thousands of global options with our flexible vacation exchange program available through the SMV Network…"

> – Sol Meliá (2004) –

> "Since the new owner is not part of Meliá Hotels International, the vacation club will not be affiliated with the Meliá Vacation Network."

> – Sol Meliá (2019) –

**(J)**    **What were Plaintiffs and class members left with in the end**

    4.123   While Melia International boasted, even before this Honorable Court, that its sales were in excess of $1,750,000,000.00 in the year 2007, that Meliá International had "immense goodwill," and operated more than 300 hotels in 30 countries, *see*, Civil No. 09-1138 (SCC) at D.E. 45, after it defrauded Plaintiffs and class members, all that was left of the "dream ticket to a world of unparalleled vacation choices" was the structure depicted below.



In sum, a shell of a Vacation Club structure with a mere 42 units assigned, without any access or right to the former Hotel Gran Meliá, now the Coco Beach Resort. And with a worthless RCI network exchange program that can never be compared to Sol Meliá Vacation Club.

4.124  That is a far cry from Mr. Gabriel Escarrer Julia (2004) offer of a dream "ticket to a world of unparalleled vacation choices…return to your Home Resort or **explore thousands of global options** with our flexible vacation exchange program available through the Sol Melia Network." *See*, ¶ 1.5 above.

**(K)    Prior relevant causes of action which interrupt any statutes of limitations**

4.125  Two (2) prior lawsuits have been filed before the Commonwealth of Puerto Rico's Court of First Instance in Fajardo regarding the breaches described in this Complaint and similar facts. They are the following: (i) *Adriana Aviles, et. al., v. Sol Meliá V.C. Puerto Rico Corp.*, FA2019CV01381, and (ii) *Francisco Sobrino, et. al., v. Sol Melia V.C. Puerto Rico Corp.*, FA2020CV00545.

4.126    The case titled *Adriana Aviles, et. al., v. Sol Meliá V.C. Puerto Rico Corp.*, FA2019CV01381, was removed to this Honorable Court by Meliá International in the year 2020, and ultimately dismissed, *without prejudice*. Upon removal, the case was assigned Civil Case No. 20-01146 (GAG).

4.127    Meanwhile, the case titled *Francisco Sobrino, et. al., v. Sol Melia V.C. Puerto Rico Corp.*, FA2020CV00545, is currently pending before the Court of First Instance of Fajardo.

## V.    DEFINITIONS AND ADMISIBILITY OF THE CLASS

5.1    This Class Action is filed by the representative Plaintiffs mentioned in the caption of this case at Section III, appearing in person and representing other members who, together with such Plaintiffs, form a "Class", as defined in section 3.5 above, in accordance with the provisions of CAFA, Puerto Rico Law 118 and Federal Rule of Civil Procedure 23.

5.2    There are 2,232 members of this Class Action who are all in similar circumstances throughout the fifty (50) states of the Union, foreign nations and Puerto Rico. Therefore, it would be impractical (if not impossible) to name them all, each individually, and add them all as Plaintiffs herein. Notably, they are spread throughout multiple jurisdictions and countries.

5.3    This case presents some common, typical and evident issues of fact and of law, which apply to all the members of the Class Action. The claims contained herein arise from the Sol Meliá and Meliá International's unauthorized sale of the Hotel Meliá in Rio Grande to Coco Beach LLC, and their unilateral cancelation of the *vacation ownership rights* purchased by the Plaintiff and class members from the co-defendants.

5.4    The requirement for numerosity for eligibility to qualify as a class action status contained in Fed. R. Civ. P. 23(a)(1), CAFA and Puerto Rico Law 118 is met in this case. Note that the class members exceed 2,000 members. It is not necessary to prove that it is impossible to consolidate

all the claims of individual Plaintiffs.  It is enough to show that such consolidations would entail serious obstacles to hearing the case, as is evident herein.  Additionally:

    a. The members of the Class Action are spread out throughout the fifty (50) states of the Union, foreign nations and Puerto Rico.

    b. It is extremely difficult to identify every member of the Class Action at this time.

    c. The nature of this case allows for common allegations to be made, which prevail over the details applicable to the members of the Class Action individually.

    d. The cost of an individual action of this kind would be quite substantial for most of the members of the Class Action, and such costs would undermine the ability of each member to enforce their rights individually.

    5.5    All of the common issues of fact and of law mentioned above affect the representative Plaintiffs and the other class members of the Class Action; therefore, the requirement for commonality contained in Fed. R. Civ. P. 23(a)(2), CAFA and Puerto Rico Law 118 is met. In addition, these issues prevail over others that separately affect the Plaintiffs and other members of the Class Action. It is clear that this action is the appropriate and best option available to settle this dispute.[12]

    5.6    The claim has legal identity given that there are no conflicting interests among the Plaintiffs and the other Class members, or between any of them. Their aim is to recover their initial investments, all maintenance fees paid to Sol Meliá and Meliá International after Hurricane María and while the "home resort" hotel remained closed, compensation for the co-defendants' breach of contract, other plus damages, costs and attorney's fees.

    5.7    The requirement of adequate representation contained Fed. R. Civ. P. 23(a)(4), CAFA and Puerto Rico Law 118 is also met, given that:

---

[12] *Juarbe v. Vaqueria Tres Monjitas*, 169 DPR 705 (2006).

a. There is no conflict between the interest of the absent members and the Plaintiffs representing the Class, since the claims included in the complaint apply to the whole Class; and,

b. The Plaintiffs mentioned in the caption of this case and their attorneys shall argue this chase aggressively, competently and vigorously. The undersigned attorneys are experienced in this kind of Class action and shall act in the best interest of each and every one of the Class members, as well as in furtherance of justice.

5.8     Furthermore, the requirements imposed by Fed. R. Civ. P. 23, are also met for the following reasons:

a. The existence of separate actions of or against individual Class members would create a risk of (i) inconsistent or varied judgment with respect to the individual class members, which might establish incompatible rules of conduct for the party in opposition to the class; or (ii) judgments with respect to individual class members who, for all practical purposes, would have the interests of the other members who are parties to the particular judgment or who would worsen or substantially hinder their ability to protect their interest;

b. As stated above, the issues of law common to the Class members prevail over any questions affecting only individual members and the class action is the best option available for the fair and efficient settlement of this case, taking into account (i) the interest of the Class members in individually controlling the handling or defense of separate actions; (ii) the desire to consolidate the resolution of the claims in this Honorable Court; and (iii) the fact that trying this action as a class action does not entail any substantial difficulties.

5.9     Likewise, a Class action constitutes the suitable mechanism, and the best option if compared to any other method to conduct this claim. That said, the requirements set forth in Puerto Rico Law 118, necessary to determine whether the class action is the best option available to redress the member rights, are also present. *To wit*: (i) there is a common issue of fact or of law; and, (ii) the class action is the best option available for the fair and efficient settlement of the dispute.

5.10    Notably, Puerto Rico Law 118 also mentions that limited availability of legal options for consumers to claiming small amounts of money from big business, the Act authorizes consumers to proceed directly to the Courts to vindicate their rights without the need of seeking redress before governmental agencies. Said Act also grants double damages.

## VI.    <u>CAUSES OF ACTION</u>

**(A)    <u>First Cause of Action: Violation of Laws 252 and 204, Breach of Contract and Infringement of the Principles of Contractual Good Faith – Declaratory Judgment</u>**

6.1     Plaintiffs re-allege and incorporate by reference each and every allegation previously set forth in this Class Action Complaint.

6.2     Sol Meliá and Meliá International's bilateral sale of the "home resort" hotel and the cancelation of the class members SMVN benefits and any and all other benefits to which they were entitled to under the Meliá brand was contrary to the agreements executed by the parties, since it was represented to said class members that they would enjoy their Meliá brand *vacation ownership rights* and membership benefits for fifty (50) years.

6.3     The facts of this action constitute a clear violation of Laws 252 and 204, a breach of contract and an infringement of the principle of contractual good faith by co-defendants.

6.4     As regards the performance of contracts and the principle of good faith, the Puerto Rico Supreme Court has held that: As from the moment the contract is perfected, it becomes binding "not only with respect to what has been expressly agreed, but also with respect to the consequences

44

that, according to its nature, are consistent with good faith, usage and the law". Ramos Lozada v. Orientalist Rattan Furniture, Inc., 130 DPR 712 fn. 12 (1992).

6.5     Law 204 requires that companies that market and sell *vacation ownership rights*, such as co-defendants, disclose to consumers <u>all</u> core issues for their contracts in a conspicuous, transparent and efficient manner, consistently with contractual good faith, so that consumers can express their consent free of any defect when purchasing the timeshare. *See*, Statement of Legislative Intent, Law 204.[13]

6.6     Law 204 sets that all documents presented by the company shall fully and precisely disclose all material characteristics of the *vacation ownership rights* plan. See Section 5-102. In particular, it shall precisely establish the "term of duration of the rights of the timeshare owners".

> **Representing to a potential buyer of a timeshare that the term of duration of said timeshare is longer tha**n the shortest of the following: (i) the term of availability for use and occupation of the place which is part of the project or the accommodations existing therein where said buyer has a timeshare; or (ii**) the term of duration of the timeshare plan**, shall be deemed to be a violation of this chapter. The developer shall also disclose the term of availability of each place within the timeshare plan. Section 5-102(4).

(Emphasis added).

6.7     Section 5-102 (16) on disclosure to potential buyers sets forth that any other information requested by the Company must be disclosed in order to achieve complete and reasonable disclosure to potential buyers of the *vacation ownership rights* plan.

6.8     Moreover, Section 7-102(6), (8) and (9) establish that no offer of a *vacation ownership rights* plan may make an incorrect or deceiving representation on: 1) the… scope, extension, term of availability,… of the incidental benefits or places belonging to a *vacation ownership*

---

[13] Pursuant to Law 204 Section 1-1-4(45), conspicuous implies that the font shall be at least two points bigger than the biggest font of the page where it appears, without consideration the head of the page but under no circumstances shall it be inferior to the ten (10) points.

*rights* plan; 2) the content… of the rights and interests, privileges, benefits or obligations of buyers  or owners pursuant to the terms and conditions or their sales agreements or of this chapter;

6.9     Likewise, Section 8-101(6) and (11) set forth that the potential buyer must be given a complete and precise description about: (1) the terms and conditions of a contractual relationship between the buyer and the exchange program; (2) **whether any right may be altered by the exchange company and the circumstances under which such alterations may occur**. (Emphasis added).

6.10    The sale of the Hotel Meliá in Rio Grande and the subsequent unilateral cancelation of the agreed benefits, to the detriment of the class members, constituted a clear violation of the provisions of Law 204 mentioned above and the principles of contractual good faith. That is to say, co-defendants deceived class members by promising them a series of benefits under the Meliá brand which were later on unilaterally canceled.

6.11    In the contractual relationship between Class members and Defendants, as in any other contractual relationship, there is a fundamental obligation to act both in good faith and in accordance with the law, which has been violated by co-defendants.

6.12    The duty to act in good faith is a guiding tenet in any legal relationship and consists in loyalty in dealing with somebody, behaving honorably and loyally. It implies keeping one's word and not breaking nor abusing someone's trust as well as acting as it can be expected from those who, thinking in an honorable manner, participate as contracting parties." [14]

6.13    The Supreme Court of Puerto Rico has held that "the good faith requirement is of the essence and, as such, it extends to our entire legal system. 'The ethical nature of each act shall be examined in the light of the particular circumstances, but behaving in accordance with the principle of

---

[14] *Berrios v. Universidad de Puerto Rico*, 116 D.P.R. 88 (1985); *Producciones Tommy Muñiz v. COPAN*, 113 D.P.R.  517 (1982). *Velilla v. Pueblo Supermarkets, Inc.*, 111 D.P.R. 585 (1981); *International General Electric v. Concrete  Builders*, 104 D.P.R. 871 (1976).

good faith is a general tenet that is present in all legal relationships.'" [15]

6.14    The codefendants' conduct caused serious damage to class members, consisting in the loss of the product bought and any other remedy that may be available at law.

**WHEREFORE**, it is hereby requested in the first cause of action that a Declaratory Judgment be issued in order to determine that co-defendants violated Law 204, breached the contracts entered into with class members and violated the principle of contractual good faith and, consequently, they are liable for the damages arising from said unlawful conduct, consisting in the economic loss of the product and any other remedy that may be available at law. Trial by jury is demanded.

### (B)    Second Cause of Action: Statutory Injunction under Puerto Rico Law 118

6.15    Plaintiffs re-allege and incorporate by reference each and every allegation previously set forth in this Class Action Complaint.

6.16    To this day, Coco Beach LLC continues to unlawfully charge maintenance fees to class members, and therefore it is hereby requested that the Court issues a prohibitory injunction preventing Coco Beach LLC from prospectively collecting said fees.

6.17    As abovementioned, class members did not hire the benefits of Coco Beach LLC brand. They solely and exclusively hired the Meliá brand benefits, with all the significance and reach of the prestigious brand and the access to its different clubs throughout the world.

6.18    Since said agreement was unilaterally cancelled by Meliá International and Sol Meliá PR, the payment of a maintenance fee to Coco Beach LLC by class members for a benefit they no longer receive is unacceptable, unjust and with no legal basis.

---

[15] *Catalytic Ind. Maint. Co. v. F.S.E.*, 121 D.P.R. 98, 113 (1988).

6.19    Law 118, 32 L.P.R.A. § 3343, sets forth that this Court "shall be vested with the power to prevent, avoid, stop and punish actions detrimental to consumers and/or traders, irrespective the amount involved and, during the proceedings, prior to final judgment, the Court may issue **restrictive and prohibitory injunctions**, as it may deem fair and equitable with respect to the conduct that motivated the action."

6.20    To that end, in accordance with the applicable provisions of Fed. R. Civ. P. 23 stated above, and of Law 118, Plaintiffs request that Coco Beach LLC be ordered to immediately cease collection attempts of maintenance fees during the pendency of this suit. Initially, said period commences upon Coco Beach LLC being served with process in this case and for the period to one (1) year, revisable prior to said term elapsing.

**WHEREFORE,** it is hereby requested in this second cause of action that, pursuant to Puerto Rico Law 118, section 3343, and Fed. R. of Civil P. 23, the Court order Coco Beach LLC the immediate end of any collection attempt of maintenance fees during the pendency of this suit. Trial by jury is demanded.

(C)    **Third Cause of Action: Damages under Puerto Rico Law 118**

6.21    Plaintiffs re-allege and incorporate by reference each and every allegation previously set forth in this Class Action Complaint.

6.22    As a result of the violation of Puerto Rico Law 204, the breach of contract and the infringement of the principle of contractual good faith, co-defendants have enriched themselves to the expense of Plaintiffs in no less than USD 140,000,000.00,[16] resulting from the money investments paid

---

[16] This number arises from the average of investments made by the members (purchase prices and financing fees) multiplied by two thousand. Said number is not an exact representation and it may considerably increase during discovery.

by Plaintiffs and class members to the co-defendants for the purchase of the *vacation ownership rights* that included SMVN membership, which shall have to be returned in full.

6.23    Likewise, co-defendants Sol Meliá and Meliá International continued to charge maintenance fees, representing that they would reopen soon, after Hurricane María, something that never happened. That sum represents and additional $4,464,000.00.

6.24    Subsequently, co-defendant Coco Beach LLC continued charging maintenance fees, despite the fact that the benefits that the class members agreed upon with Sol Meliá and Meliá International were unilaterally canceled by the latter two (2). That sum represents and additional $8,000,000.00.

6.25    Therefore, we hereby request that the payment of the maintenance fees corresponding to the period between October 1, 2017, and the present, be reimbursed and until judgment is rendered on the whole merits of the case.

6.26    Section 3 of the Puerto Rico Law 118, 32 L.P.R.A § 3343, sets forth in its relevant part that the Court shall impose in its ruling or judgment and amount equal to the liquidated damages, which in the instant case is of no less than USD 140,000,000.00 in damages, resulting in USD 280,000,000.00, plus a reasonable amount for attorney's fees, as well as legal interest for the damage caused and costs and expenses of suit.

**WHEREFORE,** it is hereby requested in this third cause of action that co-defendants be ordered to pay damages in an amount not inferior to USD 280,000,000.00 and to reimburse the sum collected as maintenance fees from the period between October 1, 2017, and the present, which shall continue to increase until judgment is entered, should Coco Beach LLC continue to charge maintenance fees, with any other remedy available pursuant to law. Trial by jury is demanded.

**(D)**    **Fourth Cause of Action: Standard Breach of Contract**

6.27    Plaintiffs re-allege and incorporate by reference each and every allegation previously set forth in this Class Action Complaint.

6.28    The causes of action arising under Articles 1054 y 1060 of the Puerto Rico Civil Code of 1930, among others, are asserted against the co-defendants.

6.29    Pursuant to Article 1054 of the Puerto Rico Civil Code, id., those who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnification for the losses and damages caused thereby.

6.30    The co-defendants failed to comply with their obligations towards the Plaintiffs and class members when they sold the "home resort" hotel to Coco Beach LLC. Sol Meliá and Meliá International and canceled all the class members' Club Meliá *Vacation Network* benefits and stripped them from any and all benefits to which they were previously entitled to under the Meliá brand. In sum, the co-defendants terminated the  Plaintiffs and class members *vacation ownership rights*.

6.31    Such breaches have caused the Plaintiffs and class members upwards of $150,000,000.00 in damages caused by the breach of their contract obligations.

6.32    Further, the Plaintiffs and class members demand that their *vacation ownership rights* be reinstated, based on the terms originally agreed upon, via Meliá International's assignment of a new "home resort" at one of its international Sol Meliá Vacation Club resorts for the remaining thirty-seven (37) years of their contacts.

**WHEREFORE**, Such breaches have caused the Plaintiffs and class members upwards of $150,000,000.00 in damages caused by the breach of their contract obligations, plus interest, costs of litigation and reasonable attorney's fees. Trial by jury is demanded.

(E)     **<u>Fourth Cause of Action: Tortious Interference with a Contract</u>**

6.33     Plaintiffs re-allege and incorporate by reference each and every allegation previously set forth in this Class Action Complaint.

6.34     This cause of action arises under Article 1802 of the Puerto Rico Civil Code and is asserted against the co-defendants.

6.35     Pursuant to Article 1802 of the Puerto Rico Civil Code, <u>id</u>., a person that causes damage to another because of fault or negligence is required to repair or indemnify the damages caused.

6.36     The Puerto Rico Supreme Court has recognized tortious interference with a contract as a *tort*. In this case Coco Beach LLC and Meliá International knew of the existence of the VPA, NSA, A&U and VR contracts subscribed between Sol Meliá and the class member, nevertheless, they chose to interfere with those contracts with the end result being besides that the "home resort" hotel was sold to Coco Beach LLC without a Meliá flag, and that Sol Meliá and Meliá International also canceled all the class members' SMVN benefits and stripped them from any and all benefits to which they were previously entitled to under the Meliá brand. Such effects were foreseeable and known the Coco Beach LLC and Meliá International. Such conduct was intentional.

6.37     Further, Coco Beach LLC and Meliá International negotiated the sale of Hotel Meliá in Rio Grande all the while that "home resort" hotel remained closed after Hurricane Maria and knew that Sol Meliá would not reopen the timeshare hotel. Nonetheless, they conspired to keep the hotel closed while Sol Meliá and Meliá International continued to charge the class member fees subject to the three (3) executed contracts. That conduct was willful and intentional.

6.38     In consequence, the Plaintiffs and class members demand that the co-defendants jointly and severally indemnify them in a sum no less than $140,000,000.00, which represents the

damages caused to them.

**WHEREFORE**, Such negligent and intentional acts of interference with the contracts caused the Plaintiffs and class members upwards of $140,000,000.00 in damages, plus interest, costs of litigation and reasonable attorney's fees. Trial by jury is demanded.

**(F)**     **<u>Fifth Cause of Action: Attorneys' Fees and Payment of Interest and Costs</u>**

6.39     Plaintiffs re-allege and incorporate by reference each and every allegation previously set forth in this Class Action Complaint.

6.40     Pursuant to the abovementioned provisions, Plaintiffs request that this Court order co-defendants the payment of a reasonable amount of attorneys' fees, which shall be determined based on a percentage of the amount that may be granted as damages when appropriate.

6.41     Accordingly, Plaintiffs request that costs and expenses of suit be borne by co-defendants, as well as the accumulated interest as from the date of the filing of this Complaint.

**WHEREFORE,** in this fifth cause of action, Plaintiffs respectfully request that all costs and expenses relate to the filing of the suit, and attorneys' fees corresponding to a Class Action and the corresponding interest accumulated as from the filing of this Complaint be awarded against the co-defendants.

**VII.    <u>PRAYER FOR RELIEF</u>**

To summarize, the appearing parties request this Honorable Court that this Complaint be sustained and consequently:

(i)   That the case be admitted as a class action as requested.

(ii) That a Prohibitory Injunction be issued under Puerto Rico Law 118 ordering the Co-Defendant Coco Beach LLC to cease the collection of maintenance fees from the Plaintiffs and class members.

iii) That a Declaratory Judgment be issued declaring Defendants' violation of Law 204, breach of contract and infringement of the principle of contractual good faith to the detriment of Plaintiffs and the class members.

iv) That the corresponding damages be granted, with the double penalty under Puerto Rico Law 118. The preliminary estimate amount for damages is no less than USD 280,000,000.00.

v) That the corresponding costs and expenses of suit and attorneys' fees, plus the corresponding interest calculated as from the day this Complaint is filed be awarded against the co-defendants.

vi) That any other remedy available to Plaintiffs and class members in law be accordingly granted.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on August 22, 2024.

**H. LÓPEZ LAW, LLC**
Metro Office Park
Street 1, Building 11, Suite 105A
Guaynabo, Puerto Rico 00968
Telephone: (787) 422-0243
www.hlopezlaw.com

*/s/Heriberto López-Guzmán*
**Heriberto López-Guzmán**
USDC-PR No. 224611
hlopez@hlopezlaw.com

**TREBILCOCK LLC**
Metro Office Park
Street 1, Building 11, Suite 105A
Guaynabo, Puerto Rico 00968
Telephone: (787) 948-0067

*/s/Thomas Trebilcock Horan*
**Thomas J. Trebilcock-Horan**
USDC-PR No. 220514
tt@trebilcockllc.com